IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 12, 2024 Session

## CITY OF MILAN, TENNESSEE, ET AL. v. FREDERICK H. AGEE

Appeal from the Chancery Court for Gibson County
No. 24295    Michael Mansfield, Chancellor

———————————————————

### No. W2024-00200-COA-R3-CV

———————————————————

This appeal arises from a dispute between two municipalities and the district attorney general responsible for prosecuting cases in the jurisdiction in which the municipalities lie. The district attorney general threatened to cease the prosecution of cases in the courts of the municipalities and stated that he would only continue to do so if the municipalities provided an additional assistant attorney general position for his office or funding for such a position.  The district attorney general justifies his threat by citing Tennessee Code Annotated section 8-7-103(1), which he asserts requires municipalities to fund additional prosecutorial personnel in order for his duty to prosecute cases in municipal court to be triggered.  The municipalities filed a complaint for writ of mandamus and later amended their claims to include a request for declaratory judgment.  The trial court ordered that the municipalities were entitled to a declaratory judgment "that they ha[d] provided 'sufficient personnel'" to the district attorney general and that he could not avoid the responsibility of prosecuting cases "by invoking Tenn. Code Ann. § 8-7-103(6)."  The trial court also determined that the district attorney general had a "clear statutory mandate" and issued a "peremptory writ of mandamus" compelling the district attorney general to comply with the statute.  The district attorney general appeals.  Finding that Tennessee Code Annotated section 8-7-103(1)'s "personnel requirement" does not refer to prosecutorial personnel, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter, Cody N. Brandon, Senior Assistant Attorney General, Scott C. Sutherland, Senior Deputy Attorney General, and Liz Evan, Assistant Attorney General, for the appellant, District Attorney General Frederick H. Agee.

Michael A. Carter, Milan, Tennessee, and Michael R. Hill, Trenton, Tennessee, for the appellees, City of Milan, Tennessee, and City of Trenton, Tennessee.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This action involves a conflict between Mr. Frederick H. Agee, District Attorney General for the 28th Judicial District of Tennessee and two of the municipalities within his district. As relevant to the office of the District Attorney General, the 28th Judicial District includes four circuit courts, three juvenile courts, one domestic violence court, four general sessions courts, and two municipal courts located in Trenton and Milan, Tennessee. This conflict involves the municipal courts in Trenton and Milan, and those cities are the appellees.

General Agee was sworn in as District Attorney General for the 28th Judicial District on October 21, 2020. He was appointed to finish out the term of General Garry Brown, who retired. General Agee completed General Brown's term and then won an elected term in August 2022. At some point in the fall of 2021, General Agee began to inquire about certain changes to be made to the municipal court in Milan, Tennessee, as court days were running past the "normal close of business hours." General Agee, Milan Municipal Court Judge Collins Bonds, the Milan Police Chief, and other city officials attended a meeting and discussed the idea of Milan Municipal Court meeting weekly instead of bi-weekly. After this meeting, General Agee began to consider what his office was "getting out of staffing this Municipal Court."[1] He reached out to other district attorney generals in Tennessee and the Tennessee Attorney General's office. Later, Tennessee Code Annotated section 8-7-103 and various Attorney General opinions were brought to his attention. He concluded that, pursuant to the statute, the municipalities "should be staffing a prosecutor – at a minimum" and that he "did not have to staff the court unless they provided a prosecutor."

---

[1]Municipal courts typically hold jurisdiction in cases involving the violation of laws and ordinances of the municipality, arising under the law and ordinances of the municipality, and to enforce any municipal law or ordinances that mirrors, substantially duplicates, or incorporates by cross-reference the language of a state criminal statute, if the criminal statute is a Class C misdemeanor and maximum penalty prescribed is a civil fine not I excess of fifty dollars. Tenn. Code Ann. § 16-18-302(a)(2). However, a municipal court may also exercise concurrent jurisdiction with courts of general sessions if the municipal court possessed and exercised such jurisdiction on and before May 11, 2003, or since that time has had such jurisdiction conferred upon it in accordance with Tennessee Code Annotated section 16-18-311. Tenn. Code Ann. § 16-18-302(c). Both the cities' municipal courts in this matter have concurrent jurisdiction with the General Sessions Court of Gibson County for criminal cases which occur in each city's respective corporate limits.

After coming to this conclusion, General Agee contacted the City of Milan to inform it of his conclusion. Various meetings and negotiations about the issue took place, and at some point, the City of Trenton was also informed of the conclusion. After eight or nine months of negotiation, no agreement had been reached. At that point, General Agee sent a letter to the City of Milan stating that, beginning on September 1, 2022, he would no longer be prosecuting cases in the city's municipal court, and at some point, he communicated with the City of Trenton to inform it of the same thing. In response, both the City of Milan and the City of Trenton ("the Cities") filed a "complaint for writ of mandamus" on September 6, 2022, seeking to compel General Agee to continue prosecuting cases in their respective municipal courts.

The trial court entered an Alternative Writ of Mandamus on September 6, 2022, directing General Agee to continue prosecuting criminal law violations in the cities' municipal courts "pending further orders" and ordered him to show cause, if any, why he should not be required to do so. Subsequently, General Agee filed a motion to dismiss and a motion to revise or vacate the alternative writ. In that motion, General Agee claimed the writ issued by the trial court did not comply with Tennessee Code Annotated section 29-25-102(b) because it compelled him to continue prosecuting cases and to show cause as to why he should not be required to do so, rather than requiring him to perform one of those actions as an alternative to the other.[2] This motion was discussed during a hearing on October 12, 2022, in which General Agee's counsel indicated that it was his intent to not appear in municipal court and then to show cause as to why he was not required to do so. This led to an issue regarding whether the trial court should appoint a pro tempore district attorney general until the dispute was resolved. However, during the proceedings on November 1, 2022, General Agee communicated his intent to continue to appear in the municipal courts at least through the end of that month, and perhaps for the rest of the litigation, depending on how the proceedings progressed. It appears that this issue became moot, as despite the litigation, General Agee's office never failed to appear in municipal court. Regardless, after these hearings, the writ of mandamus was revised by the trial court to provide General Agee with an alternative to performance by showing cause as to why he was not required to do so by filing a sworn answer and going to trial. Subsequently, the trial court ruled on General Agee's motion to dismiss, which it denied after the November 1, 2022, hearing by order dated November 2, 2022.

On December 20, 2022, the cities filed a motion to amend the complaint. This amended complaint maintained that the cities were entitled to a writ of mandamus but added an additional claim for relief pursuant to the Declaratory Judgment Act. *See* Tenn. Code Ann. § 29-14-101 *et. seq*. The court granted the motion to amend by order dated January 18, 2023. General Agee filed an answer on March 21, 2023 which was followed

---

[2] Tennessee Code Annotated 29-25-102(b) states: "[t]he alternative writ commands the defendant to do the act required to be performed or show cause before the court forthwith, or at a specified time and place, why the defendant has not done so, and that the defendant then and there return the writ."

by a motion for summary judgment filed on July 28, 2023. This motion was denied, and the parties proceeded to trial on September 20-21, 2023.

The first witness called was Judge Collins Bonds, the municipal court judge for the City of Milan. Judge Bonds stated that he began serving as municipal court judge of Milan in 1972. He explained that, when he began, the municipal court did not have concurrent general sessions jurisdiction and would only meet for two hours every Saturday or every other Saturday without a bailiff or clerks. He stated that since the court was granted general sessions jurisdiction, municipal court began hearing state criminal law violations. The court now has three sheriff's deputies, a clerk of court, three deputy clerks, and a bailiff present at sessions involving the prosecution of criminal violations. He also stated that court now meets several times per month with the second, fourth, and fifth Wednesdays of the month constituting "state days" in which the prosecutor comes to prosecute state criminal cases. Judge Bonds finally stated that the two previous district attorney generals would typically send only one assistant district attorney to municipal court to prosecute cases on "state days." However, since General Agee has taken over, there would be anywhere from one to four assistant district attorneys present and that sometimes those present would differ in the morning and afternoon court sessions.

Next, Ms. Brenda Ward was called to testify. She formerly served as a clerk in Trenton municipal court. She stated that, when she began, court would meet twice per week, and one of the days was devoted to criminal violations. She also explained that, when she began, she was operating as a member of the mayor's office. After the court was granted general sessions jurisdiction, a separate clerk's office was established. Ms. Ward also stated that the Trenton police department began transporting prisoners to court and providing security and one officer acted as a bailiff. Finally, Ms. Ward indicated that the docket size in municipal court doubled once it began hearing criminal cases.

General Agee was then called to testify. General Agee began by explaining that he was initially appointed to his position on October 12, 2020, and then was elected to a full term in August 2022. He stated that, when he began, he had six assistant district attorney generals on staff, as well as having been approved for a DUI prosecutor funded by a federal grant. He stated that, since then, he has had one additional position approved and has hired a person to fill this position pending bar passage. General Agee also explained that his office was largely funded by the General Assembly's appropriations, which are allocated by the district attorney general's conference, and some prosecutors and support staff are funded directly by counties and cities and in some cases the federal government. He stated that the cities of Milan and Trenton had never provided this type of funding during his term, and he had inquired to the conference as to them having done so in the past and was informed that they had not.

General Agee was then asked about Tennessee Code Annotated section 16-2-506(28)(B), which states that the 28th judicial district is entitled to five assistant district

attorney general positions. He stated that "[the District Attorney General's] Conference doesn't follow [the statute] anymore." General Agee then explained the allocation committee process in which the legislature allocates a certain number of positions to the conference as a whole, district attorney generals submit any staffing requests, and a committee of district attorney generals who have not made staffing requests determine how the available resources are to be allocated. General Agee also reaffirmed that he believed that Tennessee Code Annotated 8-7-103(1) requires the municipalities to provide prosecutorial personnel for their respective municipal courts.[3]

General Agee was later asked about the activities of his staff and Judge Bonds's testimony that his predecessors sent typically one assistant district attorney to municipal court. General Agee confirmed that he typically directs multiple assistant district attorney generals to be present in court rather than just one as his predecessor did, as he "ha[s] a different policy than [his] predecessor." He explained that his "objective [was] to keep cases out of Circuit Court," and he directs more personnel to attend lower courts to accomplish this goal and increase efficiency for his office and the courts.

General Agee was then asked about his relationship with Judge Mark Agee. General Agee stated that Judge Agee is his uncle and that he is the former general sessions Judge of Gibson County and is now the municipal court judge for the City of Trenton. He was asked whether he informed anyone that he intended to stop prosecuting cases in municipal court because Judge Agee was going to become the municipal court judge in Trenton and denied the allegation. He later stated that he prosecuted cases in front of Judge Agee many times in General Sessions court both in his capacity as district attorney general and also appeared in his court as a defense attorney.

On cross-examination, General Agee maintained that the schedule for Milan City Court was becoming a problem during the fall of 2021. He explained court days were going past the normal close of business and that the issue needed to be addressed for the well-being of his employees. He stated that he initially reached out to Milan officials to discuss the possibility of municipal court meeting weekly. General Agee stated that, during one of those meetings, Judge Bonds indicated if court was going to meet more often, he would require a pay raise. General Agee indicated at this juncture he began to wonder

---

[3] Tennessee Code Annotated section 8-7-103(1) states:

Each district attorney general:

(1) Shall prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto, including prosecuting cases in a municipal court where the municipality provides sufficient personnel to the district attorney general for that purpose.

- 5 -

what his office was "getting out of staffing this municipal court that's created under a private act." He stated that he reviewed Attorney General opinion number 01-120 (2001) and that his takeaway was that municipalities are required to provide personnel to the district attorney generals in order for the district attorney to have the duty to prosecute cases in their municipal courts. As to Attorney General opinion number 00-042 (2000), he stated that this opinion led him to believe that he "did not have to staff the court unless they provided a prosecutor." He also indicated that he later became aware of some of the statute's legislative history, in which a senator indicated the statute required a city to pay for a district attorney to prosecute in municipal court and this was consistent with his conclusion.

General Agee stated that after reaching this conclusion and consulting with the district attorney general's conference and the Attorney General's office, he informed the cities of Milan and Trenton they needed to pay to provide him with prosecutorial personnel. He stated that, in his opinion, the situation in Milan and Trenton could be resolved like the situation in Dyersburg, Tennessee, and Newbern, Tennessee, in which the municipalities each contribute toward the funding of one prosecutor who prosecutes cases in both cities' respective municipal courts. He stated that he continued meeting with representatives from both cities over the course of the next eight or nine months, at which point he informed them of his intention to stop prosecuting cases in their respective municipal courts, and in response, he was sued. He explained that he waited until this time to stop prosecuting cases because it marked the end of his predecessor's term, which he was appointed to finish, and marked the beginning of his elected term. He also clarified that despite all of this, his office has not yet failed to appear and prosecute cases in municipal court but that he does not have the necessary resources to do so as each court needs one prosecutor if not two.

Next, Mr. Jerald Campbell testified. Mr. Campbell began working as an assistant district attorney general in the 28th Judicial District in November 2001 when General Brown was serving as district attorney general. He worked with General Brown for approximately 16 years and often prosecuted cases in Milan's municipal court. Mr. Campbell explained that he would be sent to court alone to handle the docket, unless he was conflicted out of a case, or some other issue had arisen. He also indicated that another assistant district attorney shared these responsibilities in Trenton's municipal court. Mr. Campbell left his employment during the summer of 2017 but was later rehired by General Brown on April 1, 2020, and was still working in the office when General Agee was appointed. Mr. Campbell claimed that, at first, his arrangement was the same as it was during his first interval working at the office. He would usually go to municipal court alone, but after the conflict between General Agee and the cities arose, General Agee began sending multiple prosecutors to municipal court. Mr. Campbell stated that he asked General Agee why he was sending more assistant district attorney generals to municipal court and claimed he responded by saying he was doing so as a "show of force."

Mr. Campbell also stated that he had formerly brought Tennessee Code Annotated

section 8-7-103 to General Brown's attention as a method to obtain additional staffing, but General Brown stated it was not necessary at the time. Mr. Campbell then explained that at all times he was working cases in municipal court, he never had to stay late, and only one person would consistently stay late for court and that was caused only by her own inability to commit to a decision in cases rather than the size of the docket. Mr. Campbell also stated that he believed one assistant district attorney's presence was sufficient to handle the respective municipal court dockets. He stated that General Agee's concern with the funding issue began when Judge Mueller decided not to run for a new term as the municipal court judge in Trenton. He testified that General Agee told him he did not want Judge Agee to become the municipal court judge in Trenton. Mr. Campbell then stated that General Agee told him that he intended to seek funding for a new district attorney general position because it would force the Trenton municipal court to lose money and the city would return to conducting only traffic court in municipal court rather than criminal court. Mr. Campbell also stated that, at some point, he asked about Milan municipal court functioning the same, and General Agee stated he was going to discuss the matter with Milan next.

Mr. Campbell also explained that he left the 28th Judicial District in October 2022 because he "couldn't handle General Agee anymore." He stated that, at some point, he and General Agee began having conflicts, as he was not a fan of how General Agee ran the office and treated the staff. He stated that, at one point, General Agee accused him of "trying to throw [a] case," and he never received an apology despite the case resulting in a conviction. Apparently, this accusation was made in open court and Mr. Campbell stated that he was angry with General Agee over the incident.

Next, Mr. Jeff Mueller[4] testified. Mr. Mueller served as the municipal court judge for the City of Trenton from 2014-2022. He stated that he had several conversations with General Agee in which General Agee discussed details related to the municipal court issue. Mr. Mueller testified that one day he was in his driveway and General Agee pulled in and the two had a conversation. He stated this was soon after he had announced his decision to run for the circuit court judgeship and that this was indicative of his intent to leave the municipal court bench, as a person is not permitted to be on the ballot of multiple offices. He stated that he explained to General Agee that he was leaving municipal court, despite his awareness he was unlikely to win the election. Mr. Mueller stated that General Agee asked him to reconsider this position because he wished for him to remain the municipal court judge, as the alternative was his uncle, Judge Mark Agee, filling the seat. Mr. Mueller alleged General Agee stated that he held a great deal of animosity toward Judge Agee, due to his behavior when his wife, General Agee's aunt, passed away. Mr. Mueller also claimed that General Agee stated he intended to pressure the city if Judge Agee took the

---

[4] Mr. Mueller initially represented the City of Trenton in this matter. However, prior to the trial, he filed a motion to withdraw as counsel as he realized that he would likely be called to testify at the trial. The motion was granted by written order entered on July 28, 2023.

bench.  Mr. Mueller stated that he and General Agee had two similar conversations shortly afterward, although he could not remember the specific details, other than they occurred at local events.

This concluded the Cities' proof, and General Agee moved for a directed verdict. General Agee claimed the writ was not supported and verified by an affidavit, the act being compelled was not discretionary in nature, and there was an adequate remedy available. General Agee also claimed the declaratory judgment action did not "override the defendant's sovereign immunity" and in addition would only render an advisory opinion. After arguments from both sides, the trial court denied the motion.  The defendants then began their proof.

The defendants first called Mr. Jody Pickens, who serves as the District Attorney General for the 26th Judicial District.  General Pickens stated that he has 17 total assistant district attorney generals, one of which is funded by the City of Jackson.  General Pickens was then asked about his understanding of Tennessee Code Annotated section 8-7-103(1). He responded by stating that he understood the statute to mean that district attorneys are not required to prosecute cases in municipal court unless they are provided sufficient personnel, including prosecutorial personnel.  He stated that the arrangement was in place when he started working in the office as an assistant district attorney general in 1996. General Pickens explained that the situation was in line with his understanding of Tennessee Code Annotated section 8-7-103(1) despite the fact the arrangement predated the specific enactment of the section.

Next, Mr. Danny Goodman, the District Attorney General for the 29th Judicial District, testified.  General Goodman stated that he has seven assistant district attorney generals, and one of those positions is funded by the cities of Newbern and Dyersburg. This person handles cases in the municipal courts of both cities, which both have general sessions jurisdiction.  He stated that he believes the statute means that a district attorney general does not have to prosecute in municipal court unless the cities provide personnel, including prosecutorial personnel.

The defendants also submitted the deposition testimony of Mr. Steve Mulroy, the District Attorney General for the 30th Judicial District.  General Mulroy explained that there are three municipal courts in his jurisdiction, each with general sessions jurisdiction, and each has "their own suburban prosecutor."  He stated that these prosecutors are hired and paid by the respective city, and they swear the same oath as any regular prosecutor, and they are under his supervision.  However, he did clarify that he had never been involved with hiring a person for these roles, as he had "inherited" the present prosecutors and additionally, he did not know whether he could fire them.  General Mulroy also stated that the arrangement was in place when he came into office and that he is unaware as to any written agreements binding the cities to this situation.  He was also unaware as to how the arrangement began.  However, General Mulroy did express his belief that Tennessee Code

- 8 -

Annotated section 8-7-103(1) requires the provision of prosecutorial personnel by the municipality involved.

Finally, General Agee called one witness for the purpose of rebuttal proof, Mr. Scott Kirk, who is currently serving as an assistant district attorney general in the 28th Judicial District. He stated that discussions regarding the leveraging of Tennessee Code Annotated section 8-7-103 began prior to his learning of Judge Agee's candidacy for the municipal court judgeship in Trenton. Mr. Kirk explained that while General Agee had said some negative things about Judge Agee regarding the way he ran his courtroom, there were never any comments about their personal relationship. He also stated that they had prosecuted cases in front of Judge Agee in Gibson County General Sessions and "it was a frustrating experience." This concluded the proof. Both parties then submitted their closing arguments, and the trial concluded. Additionally, General Agee submitted a post-trial brief.

The trial court entered its final order on January 12, 2024. The trial court first determined that the cities were entitled to a declaratory judgment "that they ha[d] provided 'sufficient personnel' to Defendant" and the defendant could not avoid the responsibility of prosecuting cases "by invoking Tenn. Code Ann. § 8-7-103(6) as set forth herein."[5] The trial court also determined that the defendant has a "clear statutory mandate" and thus the cities were "entitled to a peremptory writ of mandamus compelling Defendant to comply with the statute." Finally, the trial court determined that none of the underlying motivations alleged by the cities were sufficiently proven as a basis for a ruling. General Agee filed this appeal.

## II. Issues Presented

The appellant has presented the following issues on appeal which we have slightly reframed:

1. Whether Tennessee Code Annotated section 8-7-103 requires a municipal court to provide prosecutorial personnel to trigger the district attorney general's duty to prosecute cases in it.
2. Whether a writ of mandamus may serve to compel a district attorney general to prosecute cases in municipal court.

---

[5] T.C.A. § 8-7-103(6) states:

Each district attorney general:

(6) Shall have discretion in the performance of duties and responsibilities in the allocation of resources available to such district attorney general, any other law notwithstanding.

For the following reasons, we affirm in part and reverse in part the judgment of the trial court.

### III. Discussion

#### *a. Statutory Interpretation*

General Agee's primary argument as to why the trial court erred is that the trial court misinterpreted the language of Tennessee Code Annotated section 8-7-103(1). To reiterate, this subsection provides that:

> Each district attorney general:
>
> (1) Shall prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto, including prosecuting cases in a municipal court where the municipality provides *sufficient personnel* to the district attorney general for that purpose.

Tenn. Code Ann. § 8-7-103(1) (emphasis added). General Agee claims that the term "sufficient personnel" refers to prosecutorial personnel. He further argues that this language serves as a condition precedent to his duty to prosecute cases in municipal court being triggered, and thus, unless the cities provide prosecutorial personnel or funding for prosecutorial personnel, he is not obligated to prosecute cases in their respective municipal courts. Conversely, the cities contend that the term "sufficient personnel" refers to "court personnel." This would include personnel such as bailiffs and clerks, which are necessary for adjudicating cases which involve concurrent general sessions jurisdiction, mostly violations of state criminal laws, and thus, the statute does not require they provide "prosecutorial personnel" as averred by General Agee. The resolution of this case is predicated solely on the interpretation of this statute, as there is no real dispute of fact in this case. Both parties have acknowledged that neither municipality has provided a prosecutor or money for a prosecutor to General Agee, and thus, the outcome will be determined based on whether the statute requires the provision of prosecutorial personnel or not.

"Statutory interpretation and the application of a statute to the facts of a case involve questions of law and are reviewed under a de novo standard of review with no presumption of correctness afforded to the trial court." *Wallace v. Metro. Gov't of Nashville*, 546 S.W.3d 47, 52 (Tenn. 2018). "Where the statute's language is clear and unambiguous, we derive the legislative intent from its plain and ordinary meaning." *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005). Conversely, where, as here, "parties derive different interpretations from the statutory language, an ambiguity exists, and we must look to the entire statutory scheme in seeking to ascertain legislative intent." *Owens v. State*, 908

- 10 -

S.W.2d 923, 926 (Tenn. 1995). When engaging in statutory interpretation, our basic goal is to "'ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020) (quoting *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016)). "A statute that has a clear meaning is to be 'enforce[d]. . . as written[.]'" *Falls v. Goins*, 673 S.W.3d 173, 180 (Tenn. 2023) (quoting *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022)). Further, "the legislature's intent is to be 'derived from the plain and ordinary meaning of the statutory language.'" *Id.* (quoting *State v. Wilson*, 132 S.W.3d 340, 341 (Tenn. 2004)). "Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both." *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). Additionally, "'the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute.'" *Id.* (quoting *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010)). Notably, "we will not apply a particular interpretation to a statute if that interpretation would yield an absurd result." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). "Finally, in construing statutes courts must presume that the Legislature has knowledge of its prior enactments and knows the state of the law at the time it passes legislation." *Owens*, 908 S.W.2d at 926.

Although the State of Tennessee has formally existed for almost 229 years, and the statute which we are called upon to construe was enacted in 1998, it appears that the question before us is an issue of first impression. General Agee provides several arguments to support his reading of the statute. He argues that the statute's plain language indicates personnel is to be provided "to the district attorney" and that the only personnel a district attorney could be provided is prosecutorial personnel. He maintains that if such personnel is not provided, then the duty to prosecute cases in municipal court is not triggered. Second, he claims that the large amount of discretion afforded to him as a district attorney general entitles him to determine whether he should prosecute cases in the municipal courts, regardless of the interpretation of the statute. Finally, General Agee contends that the following pieces of external evidence support his interpretation of the statute: (1) two attorney general opinions, (2) the operations of other municipal courts in the state, (3) the broader statutory scheme, and (4) the legislative history surrounding the statute. Conversely, the appellees contend that the trial court's reading of the statute was correct and cite many of the same reasons as the appellants. Having reviewed each of these arguments in turn, we find that the trial court's interpretation of Tennessee Code Annotated section 8-7-103(1) was correct.

### (1) The Plain Language of the Statute

First, we consider the plain language of the statute. General Agee claims this "settles this case in [his] favor" as "[a] reasonable reader would understand that the statute" only imposes a duty to prosecute cases in municipal court where "prosecutorial personnel" is provided. General Agee claims that the text is "unambiguous," as the statute's language

requires the municipality to "provide[ ] sufficient personnel to the district attorney general." Tenn. Code Ann. § 8-7-103. He contends that the only personnel who could fulfill this requirement is prosecutorial personnel, as prosecutors are the only persons able to prosecute cases in municipal court and thereby fulfill the statute's requirements. The cities take a different view of the text. They agree the statute requires personnel to be provided to the district attorney general but claim the personnel referenced refers to personnel that can be provided, such as clerks, deputy clerks, judges, bailiffs, and transportation personnel, all of which they already provide. They support this reading with the fact that the cities are not empowered to hire prosecutors. Accordingly, they argue, under General Agee's reading, it would be impossible for them to provide personnel, and thus, impossible for them to comply with the statute. On the face of the statute, both readings could be reasonable because, while the statute is clear that personnel must be provided, it does not define what type of personnel is satisfactory. Therefore, we cannot say that the statutory language is unambiguous as claimed by General Agee, and we must employ our other rules of statutory construction and interpretation to determine the meaning of the statute.

### (2) Statutory Scheme

Next, we will attempt to interpret the statute based on its place in the broader statutory scheme. The trial court seems to have relied on this factor most heavily when determining that the cities' reading of the statute was correct. General Agee asserts that his interpretation of the statute is consistent with the broader scheme because "nothing in Title 16 cuts against the plain meaning of Tenn. Code Ann. § 8-7-103." He further asserts that the trial court erred when it determined that his reading of the statute was inconsistent with the statutory scheme and contends that what he deems to be the plain language of the statute should prevail.

The first statute to be considered is Tennessee Code Annotated section 16-18-311, which is a subsection of the "Municipal Court Reform Act of 2004." Tenn. Code Ann. § 16-18-301 *et seq*. This particular section of the act prescribes certain steps to be taken when a municipality is determining whether to confer general sessions jurisdiction upon a municipal court. Tenn. Code Ann. § 16-18-311. The municipal and county legislative bodies are instructed to "appoint a feasibility study committee." Tenn. Code Ann. § 16-18-311(5). This committee is to consist of several officials from the municipal and county governments, as well as the district attorney general and the district public defender who serve the jurisdiction. *Id.* The feasibility committee is instructed to consider several factors when determining whether an additional court with general sessions jurisdiction is necessary for the jurisdiction. Tenn. Code Ann. § 16-18-311(6)(A)-(F). One of those factors is instructive as to the present situation. Factor (E) states the feasibility study committee is to consider "[t]he extent, if any, to which the proposed plan would unduly burden the existing staffs of the district attorney general or district public defender and the extent, *if any*, to which the plan proposes adequate funding for additional staff

requirements." Tenn. Code Ann. § 16-18-311(6)(E) (emphasis added).

The statute instructs the committees to address any undue burden of the district attorney general and the provision of any funding to alleviate that burden "if any." Tenn. Code Ann. § 16-18-311(6)(E). This "if any" language indicates that there would be situations in which the addition of a municipal court with general sessions jurisdiction to a jurisdiction would not require additional funding or staff for the court to operate without unduly burdening the district attorney general's office. If, as General Agee suggests, a municipality were required to provide funding any time a municipal court was granted concurrent general sessions jurisdiction, then it would be unnecessary for the committee to consider "if any" funding was necessary or "if any" burden was being placed on the existing staff as it would be statutorily required to provide additional staffing and/or funding regardless of the burden placed on the office. This statute also helps to explain the relationships which exist among some of the other municipal courts and their respective jurisdictions as it indicates that a municipality is permitted to provide funding for additional staff requirements if the proposed plan would unduly burden the existing staff of the district attorney general. *Id.*

Thus, Tennessee Code Annotated section 16-18-311(6)(E), when read in conjunction with Tennessee Code Annotated section 8-7-103(1), indicates that the "provides sufficient personnel" language contained in section 8-7-103(1) does not refer to "prosecutorial personnel." We determine this because Tennessee Code Annotated section 16-18-311(6)(E) must be given meaning. The General Assembly is presumed to know "the state of the law on a subject under consideration at the time it acts [.]" *Smith v. Tennessee Nat'l Guard*, 551 S.W.3d 702, 710 (Tenn. 2018). Thus, in 2009, when the version of Tennessee Code Annotated section 16-18-311 was enacted which first included the requirement that the feasibility committees consider any undue burden on the district attorneys' staff and/or the need for additional staff funding, the General Assembly presumably knew that Tennessee Code Annotated section 8-7-103(1) already compelled the municipalities to "provide[ ] sufficient personnel." Therefore, the General Assembly must have had a goal to accomplish through enactment of section 16-18-311(6)(E) which was not accomplished by section 8-7-103(1). Accordingly, we must find a way to reconcile these statutes in a way which provides both with purpose and meaning. Frankly, this would be impossible using General Agee's reading of the statute. If section 8-7-103(1) required prosecutorial personnel to be provided whenever a municipal court is granted General Sessions jurisdiction, there would be no need for section 16-18-311(6)(E) to compel feasibility committees to consider whether funding for staff would be necessary, as the municipalities would already be compelled to provide funding for said staff. Conversely, these two sections can be read in harmony if section 8-7-103(1) refers to court personnel as averred by the Cities. It makes perfect sense that section 16-18-311(6)(E) would compel the municipalities to consider funding for prosecutorial staff if section 8-7-103(1) does not contemplate prosecutorial personnel but rather, court personnel. This distinction in the function of the proposed readings of Tennessee Code Annotated section 8-7-103(1)

- 13 -

demonstrates that the Cities' reading is more consistent with the broader statutory scheme. The Cities' reading permits sections 8-7-103(1) and 16-18-311(6)(E) to function harmoniously whereas General Agee's reading of section 8-7-103(1) would render section 16-18-311(6)(E) virtually meaningless.

Another portion of the statutory scheme which is instructive on our interpretation of Tennessee Code Annotated section 8-7-103(1) is Tennessee Code Annotated section 16-2-506. This subsection sets out the state's judicial districts and prescribes the number of assistant district attorney general positions and criminal investigator positions to which a district attorney general is entitled. *Id.* The subsection setting out the 28th Judicial District states that "[t]he district attorney general of the twenty-eighty judicial district is entitled to five (5) assistant district attorney general positions and one (1) criminal investigator position." Tenn. Code Ann. § 16-2-506(28)(B). Conversely, the subsection setting out the 23rd Judicial District states that "[t]he district attorney general of the twenty-third judicial district is entitled to seven (7) assistant district attorney general positions" but specifies "[t]he fifth assistant district attorney general position shall not be filled unless the full funding for the position is secured from local, federal or other funding sources apart from state appropriations." Tenn. Code Ann. § 16-2-506(23)(B). Similarly, the subsection setting out the 21st Judicial District states that, in addition to seven assistant district attorney general positions, that the district attorney general is entitled to "one (1) additional assistant district attorney general position; provided, that the funding for such additional assistant district attorney general position is provided exclusively by the municipal and county governments that comprise the twenty-first judicial district." Tenn. Code Ann. § 16-2-506(21)(C).

While it appears that the attorney general's conference does have a system in which it allocates assets to the specific jurisdictions on a yearly basis, this section clearly sets out a baseline entitlement for prosecutorial staffing. General Agee's testimony that he understood that this statute is no longer followed was not supported by any law and is contradicted by the fact this statute remains in effect and amendments are still being proposed by the legislature. *See* Tennessee S.B. 166, H.B.181, 114 G.A. (2025). The subsections above demonstrate that the legislature is aware of how to provide avenues for counties and municipalities to provide additional staff to their respective district attorney generals and can even condition the provision of some staff on the funding for a position coming from non-state sources. *See* Tenn. Code Ann. § 16-2-506(23)(B). This is further demonstrated in Tennessee Code Annotated section 16-2-508(a) which states that "[n]othing in this part shall be construed as affecting a county's authority to provide staff and other resources to the district attorney general of the district in which the county is located." This again shows that the relationships between the municipalities and municipal courts cited for support by General Agee are permitted by statute, but there is no indication they are required by statute. Had the legislature intended to condition the duty to prosecute cases in municipal court on the provision of additional staffing, it would have worded the statute accordingly.

- 14 -

As it stands, the legislature has made it clear that funding can be provided from municipal and county governments to the district attorney general for the purpose of providing staff. *See* Tenn. Code Ann. § 16-18-311(6)(E); Tenn. Code Ann. § 16-2-506; Tenn. Code Ann. § 16-2-508. Further, the legislature is clearly aware of to how to condition staffing positions on funding from non-state sources. *See* Tenn. Code Ann. § 16-2-506(23)(B). Despite this, the legislature did not specify that the personnel to be provided was prosecutorial personnel, and likewise, the presence of such a requirement would be incongruous with the "if any" language of Tennessee Code Annotated section 16-18-311(E). Accordingly, we agree with the Cities' reading of the statute.

Because the statutory scheme does not condition the duty to prosecute on the provision of staff despite providing avenues for the provision of staff, and because the scheme has statutes which are inconsistent with General Agee's reading of the statute, we find the trial court's interpretation of Tennessee Code Annotated section 8-7-103(1) was correct.

### (3) Discretion Afforded to District Attorney Generals

Next, General Agee avers that he has the "ultimate discretion in the exercise of [the duty to prosecute]." He claims that due to this discretion, he cannot be compelled to prosecute cases in municipal court, regardless of the interpretation of Tennessee Code Annotated section 8-7-103(1). General Agee supports his claim based on Tennessee Code Annotated section 8-7-103(6), which provides that district attorney generals "[s]hall have discretion in the performance of duties . . . any other law notwithstanding." He claims this "notwithstanding clause" overrides the command set out in subsection (1) which provides that district attorney generals "[s]hall prosecute in the courts of the district all violations of the state criminal statutes." Tenn. Code Ann. § 8-7-103(1). He contends that "[i]ndependent of any interpretation of subsection (1)" the trial court's ruling should be reversed because of the district attorney's "unassailable discretion." The Cities acknowledge that district attorney generals are granted a great deal of discretion but claim this discretion lies in the performance of their duties, rather than determining what those duties are.

It is certainly true that General Agee is entitled to a great deal of discretion in his role as district attorney general. *See State v. Welch*, 595 S.W.3d 615, 631 (Tenn. 2020) (stating that "decisions about 'whether to prosecute, and for what offense' are matters of prosecutorial discretion.") (quoting *State v. Gentry*, 538 S.W.3d 413, 427 (Tenn. 2017); *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 209 (Tenn. 1999) (stating that "[t]he District Attorney General's discretion to seek a warrant, presentment, information, or indictment within its district is extremely broad and subject only to certain constitutional restraints."); *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 660 (Tenn. 1994) (stating that "there are no statutory criteria governing the exercise of the prosecutorial discretion

traditionally vested in the officer in determining whether, when, and against whom to institute criminal proceedings."); *Dearborn v. State*, 575 S.W.2d 259, 262 (Tenn. 1978) (describing the level of discretion entrusted to a district attorney general as "virtually unbridled [ ] in determining whether to prosecute and for what offense.") (quoting *Pace v. State*, 566 S.W.2d 861, 867 (Tenn. 1978) (Henry, C.J., concurring)). Clearly, this discretion permits a district attorney general to assess the facts and circumstances of a case to determine how, when, and even if he or she will prosecute a particular case. *Welch*, 595 S.W.3d at 631. However, General Agee's claim that he has the discretion to refuse to prosecute cases based upon the court in which they are filed rather than according to their respective qualities contradicts Tennessee Code Annotated section 8-7-103(1)'s language, which states that the district attorney general "shall prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto."

As stated above, district attorney generals are granted a great deal of discretion in the performance of their duties, however, there are limits. *See State v. Bell*, 69 S.W.3d 171, 180 (Tenn. 2002) (stating that "when the district attorney general denies pretrial diversion without considering and weighing all of the relevant factors . . . there is an abuse of prosecutorial discretion."); *see also Effler v. Purdue Pharma L.P.*, 614 S.W.3d 681, 689 (Tenn. 2020) (stating that "the District Attorneys' broad discretion in administering criminal justice does not translate into an entitlement to bring a civil suit not authorized by the Act.") Further, district attorney generals have both a constitutional and statutory obligation to discharge the duties of their office. *Ramsey*, 998 S.W.2d at 210 (finding the town's practice of allowing its police chief to take defendants who committed crimes in Anderson County to the city court in Roane County "violated Tenn. Const. art. VI, § 5" as it "impeded the constitutional and statutory obligation of the District Attorney General. . . to discharge the duties of his office.").

The present situation is somewhat novel. Rather than the cities seeking to impede General Agee's constitutional and statutory obligation to prosecute cases as in *Ramsey*, General Agee threatens to refuse to fulfill these obligations due to factors unrelated to the facts and circumstances of the cases he is charged with prosecuting. This also differs from situations in which a district attorney general decides not to prosecute a particular case based on the facts and circumstances of that case. When a district attorney general does that, he or she is in fact performing constitutional and statutory obligations associated with the office in the pursuit of the public interest and of justice. We disagree with General Agee's contention that his discretion as a district attorney general permits him to refuse to discharge the constitutional and statutory *obligations* associated with his position as to do so would run contrary to the terms of both Tennessee Code Annotated section 8-7-103(1) and the terms of the Tennessee Constitution, which both place the *obligation* of prosecuting cases on the district attorney general. Tenn. Const. art. VI, § 5. *See Effler*, 614 S.W.3d at 689 (relying on Tenn. Const. Art. VI § 5 when it held that "District Attorneys have the duty to 'attend and prosecute according to law' those cases falling with a judicial district's

- 16 -

criminal jurisdiction.")

This is further supported by the statute itself because it states that prosecutors are granted "discretion in the performance of duties and responsibilities." Tenn. Code Ann. § 8-7-103(6). This comports with the case law which demonstrates that a district attorney is granted vast discretion in the performance of his or her duties, but not in determining whether or not to perform his or her duties.

As for General Agee's reliance on the "notwithstanding clause," while we acknowledge that these types of clauses function to exempt certain sections of law from the effects of other sections of law, the legislature is presumed to give meaning to every word of a statute. *Runions v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 549 S.W.3d 77, 85-86 (Tenn. 2018). It would be frankly confounding if the legislature were to place the words "shall prosecute" in subsection (1) of this statute to then turn around and repeal this command in subsection (6) by function of a notwithstanding clause. This would also function to make the terms of subsection (1) functionally meaningless, and we are loathe to interpret a statute in such a way. *Falls v. Goins*, 673 S.W.3d 173, 180 (Tenn. 2023).

For these reasons, we are not convinced that the discretion granted to district attorney generals would permit the refusal to prosecute cases in the courts of this state. Accordingly, we now turn to additional evidence submitted by the parties to determine the statute's meaning.

### (4) Attorney General Opinions

Next, we consider the attorney general opinions cited by General Agee. Attorney General opinions "are not binding on courts," but as "government officials rely upon them for guidance [they are] entitled to considerable deference." *State v. Black*, 897 S.W.2d 680, 683 (Tenn. 1995); *see H & R Block E. Tax Servs., Inc. v. State, Dep't of Com. & Ins., Div. of Ins.*, 267 S.W.3d 848, 861 (Tenn. Ct. App. 2008). However, while these opinions are useful, "'they are not binding authority for legal conclusions, and courts are not required or obliged to follow them.'" *In re Cox*, 389 S.W.3d 794, 799 (Tenn. Crim. App. 2012) (quoting *Washington Cnty. Bd. of Educ. v. MarketAmerica, Inc.*, 693 S.W.2d 344, 348 (Tenn. 1985)). Notably, these opinions are more "persuasive when they have been consistently repeated." *H & R Block*, 267 S.W.3d at 861. These opinions are also given more credence when they are followed by a period of legislative inaction, which is essentially "'a judicial principle that permits—but does not compel—a presumption of legislative acquiescence in a prior" interpretation of a statute where no action has been taken to overrule a reading of a statute for a period of time. *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 847 (Tenn. 2019) (quoting *Hardy v. Tournament Players Club at Southwind, Inc.*, 513 S.W.3d 427, 444 (Tenn. 2017)).

General Agee claims that the following opinions support his reading of the statute,

and when coupled with the doctrine of legislative inaction, should be given deference. The first opinion cited states that the responsibility of prosecuting state criminal actions in municipal court is only triggered where "the municipality has provided sufficient personnel to the district attorney general for that purpose." Tenn. Op. Att'y Gen. No. 01-120 (July 31, 2001).[6] This opinion is not helpful for our present purposes. The Attorney General's answer is essentially a rendition of the language of the statute itself. *Id.* Further, the analysis provides little guidance, stating, "that only where additional personnel are provided to a district attorney general does, he or she have the statutory obligation to prosecute state criminal actions in municipal courts[.]" *Id.* This does not serve to resolve the present dispute as it does not specify whether "sufficient" personnel constitutes "prosecutorial" personnel as averred by General Agee, or "court" personnel as averred by the Cities.

The second opinion cited by General Agee considers the question of whether a district attorney general is "required to appear and prosecute all criminal cases in any state, county or municipal court in his or her district?" Tenn. Op. Att'y Gen. No. 00-042 (Mar. 13, 2000). The answer was no, as the Attorney General determined that a district attorney general is vested with discretion when deciding "whether to appear or to prosecute any criminal case within his or her jurisdiction." *Id.* This opinion would appear to be supportive of General Agee's argument that the trial court should be reversed because his discretion would permit him not to appear in municipal court regardless of the provisions of the statute. Notably, this opinion is not informative as to whether the sufficient personnel referenced by Tennessee Code Annotated section 8-7-103 refers to prosecutorial personnel or court personnel. As explained above, we acknowledge the great deal of discretion afforded to district attorney generals in the performance of their duties. However, that discretion necessarily entails the performance of those duties, not the refusal to perform those duties based on factors unrelated to the cases to be prosecuted.

Having reviewed both Attorney General opinions cited by General Agee, we find that neither answers the operative question in this case. Thus, this external factor does not weigh on our interpretation of Tennessee Code Annotated section 8-7-103(1) because the opinions merely restate the language of the statute rather than expounding upon the type of personnel to be provided by the cities.

### (5) Practices of Other Municipalities and District Attorney Generals

---

[6] We would note that his is slightly different than quoted language in General Agee's brief which states "[t]he Attorney General concluded that the duty to prosecute was only triggered 'where additional prosecutorial personnel are provided to a district attorney general.'" Obviously, the placement of the word "prosecutorial" in front of the word "personnel" would be quite advantageous to the District Attorney General's stance. However, as the Attorney General's Opinion itself does not include the word "prosecutorial" in that sentence, we will assess the language as written in the opinion. We would extend caution to such misrepresentations of language in the future.

Next, in support of his reading of the statute, General Agee refers to the relationships between several other municipalities with municipal courts, and the district attorney generals in their respective jurisdictions. The evidence of these relationships includes the testimony of District Attorney Generals Jody Pickens of the 26th Judicial District, Danny Goodman of the 29th Judicial District, and Steve Mulroy of the 30th Judicial District. Each district attorney general testified that one or more municipalities within their respective districts pay to provide at least one prosecutor to operate in the municipal courts of those districts. However, none of the district attorney generals were able to testify that the arrangement came into existence because of enforcement of Tennessee Code Annotated section 8-7-103(1), despite their individual belief the statute required the arrangement. For example, General Pickens stated that the arrangement was in place when he joined the district attorney general's office as an assistant district attorney in 1996, which predated the enactment of Tennessee Code Annotated section 8-7-103 in 1998. Likewise, General Mulroy stated that he was unaware how the relationship between his office and the various "suburban" prosecutors came into effect and whether he would have the authority to hire and fire those people. Further, the simple fact that certain municipalities are engaging in an activity does not mean that the activity is mandated by statute. While it appears that these situations are mutually beneficial for the district attorney generals and municipalities involved, there is no indication the relationships commenced because Tennessee Code Annotated section 8-7-103(1) required the provision of prosecutorial personnel. Accordingly, this evidence does not weigh on our interpretation of Tennessee Code Annotated section 8-7-103(1).

### (6) Legislative History

Finally, we consider the legislative history of the statute at issue. General Agee claims that this history supports his reading of the statute and relies on some statements from one of the sponsors of the bill that amended Tennessee Code Annotated section 8-7-103(1) to include the disputed language. During a meeting of the senate judiciary committee, Senator Robert Rochelle, the bill's senate sponsor, was asked the following question: "so if [the district attorneys] feel like they don't have enough staff to prosecute they just stop prosecuting in city court?" Senator Rochelle responded, "[y]eah basically, I think that's it." He went on to say, "in other words, the city has to pay if they want the district attorney to supply a prosecutor for the city court." Conversely, the House Sponsor of the Bill, Representative Jere Hargrove, appears to have never indicated that the bill intended to require municipalities to pay their district attorney generals. Four recordings of Representative Hargrove were contained in the record and in each of them, he described the bill was intended to consolidate and simplify the statutory duties placed on district attorney generals but did not state the amended language was intended to compel municipalities to pay for district attorney generals to prosecute cases in their municipal courts.

While the statements of Senator Rochelle appear to support General Agee's reading

of the statute, we are hesitant to predicate our ruling on these statements. Tennessee Courts have long been cautionary regarding the use of legislative history when interpreting a statute. *See BellSouth Telecommunications, Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997) (stating that "[r]elying on legislative history is a step to be taken cautiously"). Further, and pertinent for our present purposes, we have previously stated that:

> [e]ven the statements of sponsors during legislative debate should be evaluated cautiously. 2A Norman J. Singer, *Statutes and Statutory Construction* § 48:15 (rev. 5th ed. 1992). . . . Courts have no authority to adopt interpretations of statutes gleaned solely from legislative history that have no statutory reference points. *Shannon v. United States,* 512 U.S. 573, 583, 114 S.Ct. 2419, 2426, 129 L.Ed.2d 459 (1994). Accordingly, when a statute's text and legislative history disagree, the text controls. *Stromberg Metal Works, Inc. v. Press Mechanical,* 77 F.3d 928, 931 (7th Cir.1996).

*Id.* at 674. Here, we cannot predicate our interpretation of this statute on the provided legislative history. Senator Rochelle made the comments relied on by the District Attorney General in response to a question posed, rather than in an opening statement or initial description of the bill. Representative Hargrove was never asked this question or a similar question. Therefore, his thoughts on whether this was one of the bill's functions are unknown. Regardless, the fact that neither included a statement that the bill was intended to make municipalities "pay the DA" in their explanation of the bill's purpose and function indicates to us that this was not the primary goal of the bill. This is further supported by the qualifying language used by Senator Rochelle in the form of "I think" when initially answering the question posed to him regarding whether the bill would require municipalities to pay District Attorney Generals. Senator Rochelle's comments would certainly be more convincing if the other evidence related to the statute also supported General Agee's interpretation. However, as explained *supra*, the evidence concerning Tennessee Code Annotated 8-7-103(1)'s place in the broader statutory scheme is not supportive of this view and is candidly much more convincing. Therefore, we find the legislative history to be unconvincing in this matter.

The trial court's decision to grant the declaratory judgment action is affirmed as to the interpretation of the statute. As to the portion of the trial court's ruling that the cities were entitled to a declaratory judgment stating they "ha[d] provided 'sufficient personnel' to [General Agee]," we likewise affirm. General Agee did not challenge that specific portion of the ruling in his brief, but rather, only argued regarding the interpretation of the statute. Further, the parties stipulated prior to the trial that there was no contest as to "the adequacy of the performance of those individuals currently employed by the [cities], including municipal court judges, municipal court clerks, and bailiffs, within their respective duties." This indicates that the sufficiency of the "court personnel" as referred to be the cities, was not at issue and we therefore affirm the judgment declaring that the cities complied with the statute.

*b.  Writ of Mandamus*

General Agee also claims that the trial court erred when it issued a writ of mandamus compelling him to prosecute cases in the cities' respective municipal courts.  He claims that the writ was inappropriate as there was no clear right to be enforced by the writ.  He also argues that the decision to prosecute is a discretionary duty rather than a mandatory one and thus is not appropriate for compulsion by a writ of mandamus.

"The general rule regarding the issuance of a writ of mandamus is that the writ is not issued to control or coerce discretionary power by a board or officer but will lie to enforce the performance of an official duty and to compel the exercise of power." *Tusant v. City of Memphis*, 56 S.W.3d 10, 18 (Tenn. Ct. App. 2001). A court will generally "not issue a writ of mandamus against a public official unless the proof shows that the official is clearly refusing to perform some nondiscretionary, ministerial act." *Avery v. Blackburn*, No. M2021-01482-COA-R3-CV, 2022 WL 3905089, at *5 (Tenn. Ct. App. Aug. 31, 2022). Usually, a writ of mandamus is "addressed to ministerial acts" but one "may be addressed to discretionary acts when the act is done in an 'arbitrary and oppressive manner' or where there has been a 'plainly palpable' abuse of discretion." *Meighan v. US Sprint Commc'ns Co.*, 942 S.W.2d 476, 479 (Tenn. 1997) (quoting *Peerless Const. Co. v. Bass*, 14 S.W.2d 732, 733 (Tenn. 1929)).

However, because it is such an extraordinary remedy, mandamus will only be issued where the petitioner does not have "a legal remedy that is equally convenient, complete, beneficial, and effective, but the remedy which would preclude mandamus must be equally as convenient, complete, beneficial, and effective as mandamus, and must also be sufficiently speedy to prevent material injury." *Meighan*, 942 S.W.2d at 479 (citing 52 Am. Jur. 2d Mandamus §§ 46, 49 (1970)).  We have previously found that a petitioner's ability to pursue a declaratory judgment meant that there was an alternative form of relief which provided the same relief sought by the writ of mandamus. *State ex rel. Aina-Labinjo v. Metro. Nashville Bd. of Pub. Educ.*, No. M2012-01176-COA-R3-CV, 2013 WL 2492653, at *6 (Tenn. Ct. App. June 6, 2013) (finding despite the fact the chancery court had jurisdiction to issue a writ of mandamus, that the cause was appropriate for remand "for an evidentiary hearing and a declaration pursuant to the provisions of [the declaratory judgment act]."); *see Brewer v. Metro. Gov't Of Nashville and Davidson Cnty.*, No. M2008-02307-COA-R3-CV, 2009 WL 4263680, at *7 n.10 (Tenn. Ct. App. Nov. 30, 2009) (stating that "if a declaratory judgment is deemed to be equally convenient, complete, beneficial, effective, and sufficiently speedy, then mandamus would not be appropriate").

As stated above, the cities were entitled to a declaratory judgment stating that Tennessee Code Annotated section 8-7-103(1) does not require a municipality to provide prosecutorial personnel in order for the district attorney general's duty to prosecute cases

to be triggered. Thus, there was another remedy available to the cities which was equally convenient, complete, beneficial, and effective as the writ of mandamus would have been. *Meighan*, 942 S.W.2d at 479. Therefore, despite our agreement with the trial court as to the interpretation of the statute, we must reverse its decision to grant the writ of mandamus.

## IV. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part. Costs of this appeal are taxed to the appellant, District Attorney General Frederick H. Agee.

_____
CARMA DENNIS MCGEE, JUDGE